## FOSTER *v.* CITY OF JOLIET.[1]

(*Circuit Court, N. D. Illinois.*   June 9, 1886.)

1. MUNICIPAL CORPORATION—CONTRACT TO BUILD WATER-WORKS—RESCISSION.
   A contract by which one S. promises a municipality to construct and operate water-works, and which contains the provision that, "in case of failure of the party of the first part to construct or maintain said water-works as herein agreed, the rights and franchises hereby granted to him shall cease and determine," is not rescinded by *ex parte* action of the municipality, *e. g.,* by a resolution of its city council, without judicial proceedings.

2. SAME—EXTENSION OF TIME FOR PERFORMANCE—INJUNCTION AGAINST MUNICIPALITY.
   Where one S. agrees with a municipality to construct and operate water-works to supply water to the public by a contract which contains the forfeiture clause set forth in the preceding head-note, and which does not make time the essence of the contract, and S. and his assignees construct and put in operation water-works not complying with the contract, and the non-performance of the contract is due largely to the acts of both parties, and in part to unsuccessful experiments authorized by the municipality, *held,* (1) that S. and his assignees are entitled, before they are liable to a forfeiture of their rights under the contract, to a reasonable time in which to perform it; (2) that an injunction lies to restrain the municipality from interference with the pipes laid, or to be laid, by S. and his assignees during the extension of time granted to them.

3. CONTRACT—WHAT IS PERFORMANCE.
   Where one contracts to supply water from artesian wells, supplying water from other sources equally good or better is not compliance with his contract.

In Equity.
*James L. High,* for complainant.
*Benj. Olin* and *Dent, Black & Cratty Bros.,* for defendant.

BLODGETT, J.   The bill in this case charges that on the fifteenth day of March, 1880, a contract was made between one Jesse W. Starr, Jr., of the first part, and the defendant city, of the other part, by which Starr agreed to construct and maintain, in the most substantial and workman-like manner, subject to the inspection and approval of the city council of defendant, an effective system of water-works, to supply the city and citizens of Joliet with water for domestic, manufacturing, sanitary, and fire purposes, and for that purpose to put down one or more artesian wells, or as many as should be required to furnish at least 500,000 gallons daily, and to put down, from time to time, new artesian wells, so as at all times to furnish the city and citizens an ample supply of water, and to a depth that would insure water of a good quality; that he would construct a reservoir with a capacity of at least 2,500,000 gallons, which should be entirely protected from surface water, into which the water from such artesian well should be conducted; that, if necessary, he would construct a stand-pipe of sufficient height into which the water should be pumped, and from

[1] Edited by Russell H. Curtis, Esq., of the Chicago bar.

which it should be distributed through the street mains; that he would furnish and lay down eight miles of street mains, of such diameter as the city counsel should approve, but not to exceed ten inches, nor be less than four inches, in diameter, with all needful valves and stop-gates, on which should be placed 50 two-way fire hydrants, to be located by the city; and that such water-works should be sufficient to throw, at one time, a one and one-fourth inch stream of water, at least 100 feet high, from any five hydrants; that he would furnish, and put into complete working order, pumping machinery, to consist of at least two sets of first-class engines, and two sets of first-class boilers, which should have a pumping capacity of at least 3,000,000 gallons in 24 hours; that he would supply private citizens along the line of the street mains with water at certain rates stipulated in the contract.

In consideration of this undertaking on the part of Starr the city agreed to give the water company exclusive rights in its streets for 30 years for water purposes, with the proviso that, in case of failure to construct or maintain such water-works, the rights and franchises granted should cease and determine; that the city would pay for the 50 fire hydrants provided by the contract to be located on the street mains an annual rental of $7,000, payable in equal quarterly installments; that the city would pass all needful ordinances to preserve the purity of the water, and protect the machinery of the water-works from injury by malicious persons, and to prevent waste of water; that, in cases of change of grade of the streets, the city would pay the cost of relaying the water mains and pipes. It was further agreed that Starr should extend the mains beyond the stipulated eight miles as fast as he could obtain an assured income of at least $1,500 per annum per mile, and to place five fire hydrants on each additional mile of main, if so requested by the city, for which the city was to pay an annual rental of $40 for each hydrant. It was further agreed that Starr should commence work within 60 days from the date of the contract, and complete the same within one year after such 60 days.

By a supplemental agreement made June 7, 1880, it was agreed that there should be ten miles of street mains instead of eight, and that the number of fire hydrants located on such mains should be sixty instead of fifty; that the size of the street mains, within the limits of four and sixteen inches in diameter, should be designated on a map to be prepared by Starr, and by him presented to the chairman of the then committee on water-works of the city council, and the sizes indicated on such map should be subject to modification within the limits of four and sixteen inches, within five days after the presentation of such map to the chairman of such committee; and that the annual rental of the fire hydrants should be $8,500, payable in equal quarterly installments; and by a further supplemental contract, dated October 9, 1880, it was provided that, in lieu of ar-

tesian wells provided for in the original contract, Starr might, at his election, supply the city with spring water from springs on and in the vicinity of the Brown farm, just east from the Rowell gravel pit, such springs of water to be thoroughly protected from surface-water drainage and surface impurities of all kinds, the stream from such springs to be banked so as to keep the surface water therefrom; but this change in the source of supply was not to dispense with the reservoir provided for by the original contract, nor in any way relieve Starr from any of the other covenants in his contract; and, if the springs should not supply the quantity of water required by the original contract, artesian wells were to be sunk, as required by the original contract.

Starr entered upon the performance of the contract; constructed the reservoir and stand-pipe; laid 10 miles of mains in the streets, and of the sizes designated upon the map duly presented to the water-works committee of the city council; and furnished and put in pumping machinery, engines, and boilers; and up to about the twelfth of December, 1881, was actively engaged in the construction of the works as provided for in the contract.

It is further charged that, in November or December of the year 1880, Starr caused a corporation to be organized by the corporate name of "The City of Joliet Water-works Company," and assigned to such corporation said contract with the city, and all his rights and privileges and interest therein, and sold and transferred to said company all the machinery, reservoirs, water-pipes, hydrants, real estate, water-rights, etc., then owned or possessed by him pertaining to such contract; that said water-works company, on the ninth of December, 1880, made and delivered to the Guaranty Trust & Safe Deposit Company of Philadelphia a mortgage upon all its lands, tenements, and water-works then owned, or thereafter to be acquired, with all its pipes, machinery, pumps, pumping engines, engine-houses, and equipments, for the purpose of securing the payment of 280 bonds of said company for the sum of $500 each, bearing date on said ninth day of December, payable to the said Guaranty Trust & Safe Deposit Company on the first day of July, 1910, with interest at the rate of 6 per cent. per annum, payable on the first days of January and July of each year; that such bonds were placed upon the market, and sold to purchasers for value; that default was made in payment of interest on said bonds, and a bill filed in this court to foreclose the mortgage; and such proceedings had under such bill that a sale was made of the mortgaged property, and complainant Foster became the purchaser of said property for and on account of the owners and holders of said bonds, who joined with him as complainants in this case; and that said Foster had been put in possession of the property under said purchase by order and decree of this court, and has since August, 1883, had possession and control of said water-works, and of the property, engines, machinery, reservoirs, pumps, and pipes

pertaining thereto; that said Foster, in behalf of the parties interested as purchasers, had expended large sums of money in improving and repairing the works, and in sinking a new well, from which an ample supply of pure water in excess of the amount called for by the contract is now obtained.

The bill further alleges that in December, 1881, the city council of the defendant city adopted a resolution declaring that all the rights and privileges of Starr under his contract were revoked, forfeited, and determined; that notwithstanding such water-works company had been in possession and control of said water-works more than a year prior to the passage of such resolution, and that complainant, Foster, was a purchaser under the sale made by this court, and has been in possession of such water-works since August, 1883, and has, with the knowledge of the city authorities, expended large sums of money in the repair and improvement of the water-works, yet the city council of the defendant city, on the twenty-third of July, 1884, adopted resolutions directing proceedings to be instituted to prevent the complainant from further operating such water-works in the city, and from repairs of said works, and the pipes pertaining thereto in the streets of the city, and to force said Foster, as the representative of the purchasers of said property, to abandon the same to the city, or some other person, at a nominal price.

The prayer of the bill is that the defendant city be restrained from commencing any suit or proceeding having for its object the forfeiture of the contract in question, and from interfering with or molesting the complainant in the use of the streets of the city for water-works purposes under the contract.

The answer admits the making of the contract in question; that Starr commenced the construction of the water-works under the contract; but avers that he did not complete the same within the stipulated time; that he did not obtain an adequate supply of water from the springs mentioned in the supplemental contract of October, 1880, and did not sink artesian wells to supply the quantity of water called for by the original and supplemental contract; that the works were not adequate to supply water for fire purposes; that there was not power adequate to throw streams of water from the five hydrants to the height called for by the contract; that the city refused to accept the works as constructed, and adopted resolutions declaring all rights under the contract forfeited. The answer further charges that the water supply since the complainant, Foster, obtained control of the works has not been pure nor healthful, nor in such quantity as the necessities of the city require; that the reservoir has not the capacity called for by the contract; that impure surface water is freely admitted thereto, and the water pumped from the well tainted thereby, and charges that it was the purpose of Starr and of the water-works company, while in charge of the works, to impose upon the city an insufficient water supply system, and impose water such as was not

contemplated by the original contract, and the supplemental contract thereto; and that the complainant also has failed since he came into control of the water-works to materially improve the water supply, either in quantity or quality, or to so improve the pumping machinery and pipes as to make a safe and reliable water system for fire purposes.

A replication was filed to this answer, and the case has proceeded to proof and final hearing.

The position of the complainants is that they and their predecessors have so far complied with the substantial features that they should be allowed to maintain and extend their water system so as to meet the demands of the residents of the city in the more densely populated area, and that they should be permitted to enjoy the exclusive right to use the streets of the city for water purposes which was granted to Starr under the contract, and which the complainants claim as successors and assigns of Starr; while the contention of the defendant is that Starr, the company, and the complainants have all fallen so far short of a compliance with the terms of the contract as to justify the defendant in treating the contract as forfeited, and denying to the complainant any rights in it.

The proof shows that about November 8, 1881, notice was given by the water-works company to the mayor and city council of the city that the water-works were completed, and ready for operation, and that soon after such notice a public exhibition or test of the capacity of the works to throw a stream of water from the five hydrants was made, which showed that they were not capable of throwing water to a height much exceeding 85 feet. Starr attributed this failure to a lack of power, and proposed to put in another set of boilers, increasing the boiler capacity one-half, upon being advised that the works would then be satisfactory to the council. But there is also proof in the case showing quite satisfactorily that one, if not the principal, reason of the failure of the works to comply with the test called for by the contract was that the mains were too small, over seven miles of the ten miles of main pipe laid being only four inches in diameter; and it is insisted that the defendant city is equally responsible with Starr for this small size of the main pipe, because the size of the pipe, between a minimum of four inches and a maximum of sixteen inches in diameter, was to be decided by the committee of the city council within five days after the map of the location of the mains should be presented to the chairman of the committee, and that such map was duly presented, and no fault found or change insisted upon.

I think it may be taken as established by the proof that these water-works, as constructed by Starr, or under his supervision, at the time the city was asked to accept them, in November, 1881, did not conform to and fill the conditions of the contract. The spring on the Brown farm was found to be wholly inadequate to furnish the supply

of 500,000 gallons per day called for by the contract, and no artesian well was sunk, or steps taken to sink one, for the purpose of supplying the deficiency. The reservoir, while large enough to hold the required quantity of 2,500,000 gallons, was not made sufficiently tight to prevent the flow or percolation of surface water into it, and was not so guarded by embankments, or otherwise, as to prevent water from the surrounding surface from overflowing or running into it. The want of sufficient power, or the small size of the mains, or both causes combined, made it impossible to throw water from the fire hydrants to the height stipulated; but the proof also shows that Starr and the company expended over $107,000 on the construction of the works, and that the complainants have, since they purchased the property, expended over $31,000 more in repairs and improvements; and that the property is now in a much better condition than it was at the time that Starr made his experiments or tests.

The action of the city council, by the adoption of the resolution of December 12, 1881, declaring the contract forfeited, cannot be considered as effective to work a total rescission of the contract, and to put Starr and those claiming under him in the position of intruders, and divest them of all rights under the contract. The forfeiture clause of the contract is: "In case of failure of the party of the first part * * * to construct or maintain said water-works as herein agreed, the rights and franchises hereby granted to him shall cease and determine." This clause does not enable one party only to the contract to set it aside, and end it, of his own will. The contract, under this clause, may be terminated for failure to construct or maintain the proposed water-works, but it must be done on some equitable basis, in which, as far as possible, justice may be done to both parties; and hence the *ex parte* act of the city declaring the contract forfeited did not forfeit it, nor terminate the rights of the water-works company in the city under the contract.

If the city authorities, in the fall of 1881, were dissatisfied with the work as then constructed, at the time when Starr announced them to be completed according to the contract, a bill in equity might have been filed at once asking for a rescission of the contract on the proper terms; but the city neglected to file such a bill; allowed the complainants, or those whom they represent, to expend over $30,000 in improvements upon the works; dealt with the complainants as the owners of the works; accepted water for the use of the public schools, police head-quarters, and the city-hall, and paid for the same without complaining; and only just before the filing of this bill did the city intimate any intention to resort to judicial proceedings for the purpose of excluding the complainant, and those whom he represents, from the streets of the city. Litigation was, however, initiated by the complainant, and it is undoubtedly the duty of this court to decide what the equitable rights of the parties are under the existing facts.

The proof satisfies me that the engines, pumps, and machinery are now, and were at the time this bill was filed, adequate to pump the maximum supply of water called for by the contract; that the reservoir is, in fact, larger than required by the contract, but is not now, and perhaps has never been, properly protected from surface water. The size of the mains, which, as it is claimed, so largely contribute to the insufficiency of the water-works for fire purposes, is, I think, so far attributable to the joint action of the two parties that the city cannot allege it as a ground of forfeiture.

It is true that Starr agreed that the works should be sufficient to throw water from five hydrants at a time, to a height of 100 feet; but if the defect in the performance of the works in this regard comes from the fact that the mains are too small, thus increasing the friction of the water column to such an extent that the force of the engines is wasted or lost, as some of the defendant's expert witnesses testify, then it may be said that Starr should have known of this defect, and was bound to remedy it within a reasonable time, notwithstanding the city authorities were informed of the size of the water mains, and did not object, but the acquiescence of the city authorities in the size of the mains put in makes the mistake a mutual one, and neither party should take advantage of it. The chief difficulty I have encountered in the case is the fact that the contract required that artesian wells should be sunk to procure the water supply. Since the complainant, Foster, has had possession of the works a well about 30 feet deep has been sunk, which would seem, from the proof, to furnish an ample supply of water; but it is not an "artesian well," as that term is usually understood and defined. In Ure's Dictionary of Arts, Manufactures, and Mines an "artesian well" is defined to be "a well or bore-hole, in which water is obtained by means of a perforation bored vertically down through impermeable *strata*, into underlying *strata* of a more or less permeable character, such stratum to be charged with water. * * * Properly speaking, an artesian well is one in which the water from the lower stratum rises above the surface of the superincumbent impermeable *strata*, but, by extension, the phrase has been applied of late years to any wells in which waters of the lower stratum are enabled to rise sufficiently near to the surface to allow of their being economically used." That is to say, an artesian well need not be a flowing well, but the water must come from beneath the impermeable stratum, so as to be uncontaminated by surface matter. Thus, the city of London contains a large number of so-called "artesian wells," sunk through the "London clay," as it is termed, and through the rock underlying this clay, into the chalk formation, where the water is found; but these wells do not overflow, the water being obtained from them by pumps. The well sunk by complainant, while it passes through a comparatively thin layer of clay, cannot, I think, be called an "artesian well;" the stratum of clay overlying the water-bearing stratum of

gravel not being thick enough, nor shown to be extensive enough, to make it certain that objectionable surface seepage will not at times contaminate the water.

By the supplemental contract of October, 1880, the parties so far waived the obligation to put down artesian wells as to accept, or agree to accept, the water from a spring or springs, provided such spring or springs should furnish a sufficient supply of water; but if the supply was not sufficient, then a resort was to be had to artesian wells. Having authorized Starr to use this spring water instead of artesian wells, he was justified in making a trial of the springs; and it was not right or equitable for the city to forfeit the contract because the experiment with the spring was a failure, but time should have been given Starr, or the water company, to bore an artesian well; but, instead of doing this, the city declared the contract forfeited, and refused to pay the hydrant rent, and thereby precipitated a financial failure upon the water company, and left the bondholders no alternative but to foreclose their mortgage, and take the water-works in the condition in which Starr and the company left them. Since that time the city has persistently denied all rights to the complainant and the company, and has placed them by its action where they could not safely proceed to complete the works without some judicial decision defining the rights of both parties. If the city at the time it passed the resolution declaring the Starr contract forfeited had filed a bill in equity asking to have the forfeiture enforced, I have no doubt a court of equity, under the circumstances, would have given the water company sufficient time to comply with the contract, and only decreed a forfeiture after the expiration of such time, in case the work was not substantially completed as required by the contract; because equity abhors a forfeiture, and a court of equity would not have enforced the forfeiture of this contract, and of the privileges granted and money expended under it, without giving a suitable opportunity to the party to fulfill it. So, now, with both parties before it, this court, under the present bill, should, I think, give the complainant time to sink an artesian well or wells; and complete or repair the reservoirs so as to exclude surface water; and to relay its mains, as far as necessary, so as to obtain, without dangerous pressure, the requisite head to throw water from the hydrants to the height of 100 feet, as required by the contract.

It is urged that the water in the well sunk by the complainant, from which the present supply is obtained, is as good, if not better, than water from other artesian wells which have been bored in that city, but this court cannot make a new contract between these parties. They have stipulated for artesian well water, and the court cannot compel the city, or its inhabitants, to accept anything else.

My conclusion is that complainants stand in such a position that they have the right now to go on and complete the works, and that no forfeiture should be allowed or enforced until they have had a rea-

sonable time to do so. The delays in completing the work, while a breach of the letter of the contract, are not such as should work a complete forfeiture of all rights acquired and money spent under it. Time was not made the essence of the contract, and the present situation of either party is not such as to entitle the city to insist upon a forfeiture. There is no proof that the city has lost anything by the delay, or that the complainants cannot now go on and fulfill the contract. A decree may, therefore, be entered declaring that the complainant is lawfully in possession of the streets of the city for water purposes under the provisions of the Starr contract, and enjoining the city from interfering with the mains and pipes already laid, and with the further extension of such pipes and mains; but that complainant shall, within the next 12 months, sink an artesian well or wells, from which to obtain an adequate supply of water for the purposes of the city as called for by the contract; and shall repair and protect the reservoir so as to fully exclude the surface water therefrom; and shall also make the works effective so as to throw the water from the fire hydrants to the height called for by the contract; and the court will retain the case until the expiration of such 12 months, or until the contract shall be substantially complied with at an earlier day, when the final decree will be entered.